| | |
|---|---|
| LABORERS' PENSION FUND, LABORERS' WELFARE FUND OF THE HEALTH AND WELFARE DEPARTMENT OF THE CONSTRUCTION AND GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY, THE CHICAGO LABORERS' DISTRICT COUNCIL RETIREE HEALTH AND WELFARE FUND, and JAMES S. JORGENSEN, ADMINISTRATOR OF THE FUNDS, | No. 15 CV 9580 Judge Manish S. Shah |
| Plaintiffs, | |
| v. | |
| INNOVATION LANDSCAPE, INC., | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

Fuertes Systems Landscaping, Inc. (which refers to itself as "Fuerte") was a union signatory company owned by Rafael Hurtado that provided residential landscaping, public park construction, and snow removal services in northeast Illinois. Since 2011, two lawsuits—which concern unpaid union obligations over two different time periods—have been filed against Fuerte, including this one. These lawsuits made it difficult for Fuerte to obtain new work, and Fuerte eventually shut down in 2016. As Fuerte struggled, Nataly Perez, Hurtado's stepdaughter, decided to open a nonunion landscaping company, Innovation Landscape, Inc., in 2014. With Hurtado's help, Innovation started as a residential landscaping company and grew to provide public park construction and snow removal services in northeast Illinois.

Plaintiffs filed this motion for partial summary judgment, alleging that Innovation should be liable for Fuerte's obligations under its collective bargaining agreement because the two entities are the same company under an alter-ego or single-employer theory.

## I. Legal Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits" show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute over a material fact exists when a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All facts and reasonable inferences are drawn in the light most favorable to the nonmovant. *Laborers' Pension Fund v. W.R. Weis Co., Inc.*, 879 F.3d 760, 766 (7th Cir. 2018). If the movant bears the burden of persuasion at trial, it must support its motion with credible evidence that would entitle it to a directed verdict if not controverted at trial. *Celotex Corp.*, 477 U.S. at 331.

## II. Background

### A. Evidentiary Standards

When ruling on summary judgment, "a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Johnson v. Rimmer*, 936 F.3d 695, 705–06 (7th Cir. 2019) (internal citation omitted). However, parties cannot circumvent the

purpose of summary judgment "by creating 'sham' issues of fact with affidavits that contradict their prior depositions." *Bank of Illinois v. Allied Signal Safety Restraint Systems*, 75 F.3d 1162, 1168 (7th Cir.1996) (collecting cases). A court may disregard new sworn testimony when it 1) contradicts that same witness's earlier sworn deposition testimony and 2) fails to explain the contradiction or resolve any disparities. *Id.* at 1167–68. *See also Kopplin v. Wisconsin Cent. Ltd.*, 914 F.3d 1099, 1103 (7th Cir. 2019) (citing *Bank of Illinois* and applying the sham affidavit rule).

Local Rule 56.1 statements serve to streamline the resolution of summary judgment motions by having the parties identify undisputed material facts and cite the supporting evidence. *See Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994). Because of this important function, district courts can require strict compliance. *Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 414 (7th Cir. 2019) (citation omitted). I disregard improperly asserted facts and deem undisputed any facts not properly controverted. N.D. Ill. Local R. 56.1.

The parties raise evidentiary issues based on the sham affidavit rule, witness credibility, and improperly controverted facts. I address below only those issues germane to the outcome of the motion.

### B. Facts

Rafael Hurtado owned Fuerte from 2002 to 2016. [120] ¶¶ 5, 9; [131] ¶ 1.[1] The company provided residential landscaping for single-family homes, public park

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are from the CM/ECF header placed at the top of documents. Facts are largely taken from responses to the parties' statements of material facts, where the original facts and responses are in one document. [120]; [131].

construction for park districts and municipalities, and snow removal services. [120] ¶ 6; [131] ¶¶ 6, 8. Fuerte serviced customers in the northeast counties of Illinois, such as Cook, Lake, DuPage, Will, Grundy, Kane, McHenry, and Boone County. [120] ¶¶ 86–87.

Hurtado was the sole owner and shareholder of Fuerte and served as the company's president and treasurer. [120] ¶ 9; [131] ¶ 1. In this role, Hurtado communicated with park district representatives; attended construction meetings; oversaw projects; tracked employee hours; prepared estimates and bids; and interfaced with clients. [120] ¶ 10. Only Hurtado had authority to hire and fire employees and make binding decisions on behalf of the company. [131] ¶¶ 15–16.

Since April 2004, Fuerte had been a party to successive collective bargaining agreements with a general laborers and construction workers union. [120] ¶ 1. Under the CBA, Fuerte was required to make contributions on behalf of covered employees to certain pension, health, and welfare funds—the plaintiffs: Laborers' Pension Fund, Laborers' Welfare Fund of the Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity, Chicago Laborers' District Council Retiree Health and Welfare Fund, and James S. Jorgensen, as the funds' administrator. *Id.*

Fuerte used nonunion employees to perform residential work, which included landscaping, planting, mulching, and the installation of brick paver patios, driveways, retaining walls, and outdoor patio kitchens. [131] ¶ 3. Fuerte's public park construction work was performed by union employees and involved "retaining walls,

paving, drainage, landscaping, concrete work, excavating, playground installation and park development." [120] ¶¶ 6–7. The CBA covered many of these residential and commercial tasks, which were required to be performed by union employees. *Id.* ¶ 8.[2]

In October 2011, the funds filed a lawsuit against Fuerte to collect union dues and benefits owed from January 2008 through January 2012. *Id.* ¶ 3. The funds sought over $4 million in back contributions, liquidated damages, and interest. *Id.* In that case, the court entered judgment against Fuerte in the amount of $3,409,308.11. *See Laborers' Pension and Welfare Funds, et al. v. Fuerte Systems Landscaping, Inc., et. al.*, No. 11-CV-7401, Dkt. No. 210 (N.D. Ill. Aug. 29, 2018). In October 2015,

---

[2] Innovation generally denies that "paving, drainage, landscaping, concrete work, retaining walls, excavating, playground installation and park development work is covered by the CBA" and that "Fuerte was required to remit fringe benefit and union dues payments for each hour spent by a Fuerte employee performing this work regardless of whether it was residential or commercial work." [120] ¶ 8. Innovation alleges that paragraph eight is "an inaccurate paraphrase" of the underlying documents, which do "not support" the funds' fact. *Id.* The first supporting document shows Fuerte as a signatory to the applicable CBAs between the Construction and General Laborers' District Council of Chicago and Vicinity and various unions, including the Concrete Contractors Association of Greater Chicago. [111-1] at 3. The second document is an applicable collective bargaining agreement, in effect from 2010 to 2013, between the laborers' council and the concrete union. *Id.* at 4–115. The funds cite specifically to Article XV of the CBA, which describes covered work as including: "all laboring work in connection with…driveways…retaining walls"; "original installation of landscaping in connection with new construction of all types"; "excavation for building and all other construction"; "concrete or aggregate for walls, footings, foundations, floor or for any other construction"; and work related to drainage. *Id.* at at 37, 38, 40, 41. Article VI of the CBA, which the funds do not cite to, states, "All Employers covered by this Agreement shall deduct from the wages of Employees covered by said contract, working dues approved by the Union for each hour worked and shall remit monthly to the Union office the sums so deducted, together with an accurate list of Employees from whose wages said dues were deducted and the amounts applicable to each Employee, not later than the 10th day of the month next following the month for which such deductions were made. Dues remittance reports shall include a report of the hours worked and the wages earned by each Laborer." *Id.* at 13. The exhibits support the funds' assertion, even though the funds failed to include the second pincite. Furthermore, Innovation's additional facts do not address the alleged inaccuracy. Because Innovation fails to properly controvert the fact, it is deemed admitted.

plaintiffs filed this lawsuit about unpaid union dues and benefits from January 31, 2012, onwards. [120] ¶ 4. On March 21, 2016, I entered judgment against Fuerte in the amount of $668,236.99 in unpaid fringe benefits and union dues. *Id.* ¶ 89.

Rosy Hurtado, Rafael Hurtado's wife and Fuerte's office manager, explained that due to the lawsuits, as of March 2013, insurance companies refused to provide bonds Fuerte needed to secure new public park construction work. *Id.* ¶¶ 25–27.[3] As a result, Hurtado had to close Fuerte, which stopped providing services by February 2, 2016. [120] ¶ 27; [131] ¶ 45. Hurtado believed the funds conspired to put Fuerte out of business: "the Union went really dirty on me," he said. [120] ¶ 90; [131] ¶ 6.

The funds argue that Innovation Landscape, Inc., a nonunion landscaping company owned by Hurtado's stepdaughter, Nataly Perez, is a disguise for Fuerte, and should be held responsible for Fuerte's legal obligations under the CBA. [109]; [120] ¶¶ 14, 37.

Before incorporating Innovation, Perez worked as a secretary at Fuerte from June 2013 to February 2014. [120] ¶¶ 14, 37. She performed clerical tasks only, like answering phone calls, taking messages, and running errands. *Id.* ¶ 14. After working as a secretary—and only one year after graduating high school—Perez opened Innovation in March 2014. *Id.* ¶¶ 37–38. She was the sole shareholder and officer of Innovation and initially paid herself $400.00 per week. *Id.* ¶ 38. Perez testified that she made an initial $200.00 shareholder contribution but did not obtain

---

[3] I refer to Rafael Hurtado as "Hurtado," Rosy Hurtado as "Rosy," and Rafael Hurtado, Jr., as "Junior," to avoid confusion among the family members.

any business loans or contemplate any type of business plan. *Id.* ¶¶ 39–40. Neither Fuerte nor Hurtado provided any start-up capital, loans, or guarantees to Innovation. [131] ¶ 5. Innovation did, however, operate from Hurtado's residence, on Mirage Avenue, Plainfield, Illinois, in 2014. [120] ¶ 37.

In 2013, Fuerte stopped providing residential landscaping for single-family residences. [131] ¶ 3. Instead, Fuerte referred residential work, including warranty repair work, to Innovation when it opened in 2014. *Id.* In one instance, Fuerte admits it subcontracted residential warranty repair work to Innovation and paid Innovation for this work. [120] ¶ 45; [131] ¶ 4. Meanwhile, Innovation provided the same residential landscaping services Fuerte had provided. [120] ¶ 43. Innovation's largest residential project that year was valued at approximately $20,000. *Id.* ¶ 47. Innovation did not own any residential landscaping equipment in 2014, so Fuerte lent Innovation the necessary equipment and tools for free—including dingos, tampers, lasers, and a dump truck. *Id.* ¶ 46.[4] Additionally, one of Innovation's first employees[5]

---

[4] Paragraph 29 of Perez's affidavit states "None of the equipment utilized by Innovation was ever owned by Fuerte." [122-1] at 13. This claim does not directly contradict Perez's earlier deposition testimony that Innovation borrowed Fuerte's equipment because Perez did not testify as to whether Fuerte owned or rented the equipment Innovation borrowed in 2014. [120] ¶ 46. Plaintiffs' motion to strike this sentence in paragraph 29 is denied. Additionally, in its response to the motion to strike, Innovation argues that Hurtado, and not Fuerte, lent Innovation the equipment in 2014, [137] at 4, after previously admitting that "Fuerte would lend Innovation the equipment and tools necessary to perform the residential landscape work." [120] ¶ 46. Innovation cannot use its response to deny a fact it already admitted in the Local Rule 56.1 statements.

[5] The parties dispute whether all of Innovation's initial employees were former Fuerte employees. [120] ¶ 42.

was Hurtado's son, Rafael Hurtado Jr., who served as Innovation's general manager from March to November 2014. *Id.* ¶¶ 42, 48.[6]

Innovation ceased operations in either October or November 2014. [120] ¶ 50; [131] ¶ 21.[7] In early November 2014, Fuerte issued Innovation a check for $11,300. [120] ¶ 50. Perez said that the check was for residential warranty repair work that Fuerte subcontracted to Innovation, as well as taxes and debts Innovation owed to suppliers. [120] ¶ 50; [111-3] at 75–76.[8] Innovation stored its tools and materials on Fuerte's premises, in Joliet, Illinois, in 2014. [120] ¶¶ 18, 52.[9] Both Junior and Perez returned to work for Fuerte in October 2014. [120] ¶ 51; [131] ¶¶ 13–14.[10]

---

[6] Perez quit Fuerte in February 2014 and incorporated Innovation on March 24, 2014. [120] ¶ 37. Both Perez and Junior were employed by Innovation in March 2014. *Id.* ¶ 48. While employed by Innovation, Perez and Junior received a paycheck from Fuerte for the pay period March 31, 2014 to April 16, 2014. [131] ¶ 12. It is unclear whether the paycheck was for work they performed for Fuerte, or for work they performed at Innovation.

[7] The parties do not explain why.

[8] Innovation's response about the $11,300 check states, in relevant part, that "Innovation admits the remaining facts set forth in paragraph 50 of the Funds SOF. Innovation further affirmatively states that the Fuerte check in the amount of $11,300 was to pay Innovation for warranty work done for residential customers of Fuerte in 2014." [120] ¶ 50. Hurtado's affidavit, signed after the summary judgment motion was filed, states the check was for warranty repair work. [131] ¶ 4. Innovation does not, however, deny plaintiffs' claim that the check was also for other obligations Innovation owed. Nor does Perez contradict or clarify her initial testimony about the purpose of the check in her subsequent affidavit. [122-1] at 8–14. Because defendants do not properly controvert Perez's testimony about what the check was for, her explanation is deemed admitted.

[9] This undisputed fact, [120] ¶ 52, may undermine another one: that Innovation did not own any equipment in 2014. [120] ¶ 46. I presume, however, that ownership of some tools and materials is not materially inconsistent with Innovation also not owning any equipment in 2014.

[10] The parties dispute whether Perez returned to Fuerte as an "assistant manager," based on Rosy's most recent affidavit, or only performed secretarial work, based on Hurtado's original deposition testimony. [120] ¶ 51; [131] ¶ 14.

In April 2015, Perez, in her personal capacity, purchased property on Plainfield Road, Oswego, Illinois. [120] ¶ 20. That August, Perez executed a two-year commercial lease with her stepfather's company, Fuerte, starting on August 1, 2015. *Id.*; [111-4] at 1–5. At some point that summer, the parties agree that Fuerte moved its office to the Plainfield Road property, along with some equipment. [120] ¶ 19. Some equipment remained at Fuerte's Joliet property. *Id.* Between August 2015 and September 2015, Fuerte paid to remodel the interior of the Oswego residence and built a cabin on the premises. [120] ¶ 21; [131] ¶ 7.

After this lawsuit was filed in October 2015, Fuerte decided to shut down, which took a few months.[11] [131] ¶ 6. In December 2015, Fuerte stopped performing public park construction and sought legal counsel to terminate operations. *Id.* That same month, Perez reopened Innovation because Fuerte was "having problems" and because Hurtado was available to assist running Innovation. [120] ¶ 53. In her role as president of Innovation, Perez testified that she reported to work at "my house" on Plainfield Road, the same location Fuerte had moved into that summer under a commercial lease.[12] [111-3] at 92; [120] ¶¶ 19–20, 53.

---

[11] For example, Fuerte was still performing snow removal work until the last week of January 2016. [131] ¶ 6. In February 2016, Fuerte, due to insolvency, engaged a third party to oversee the company's liquidation process for creditors. *Id.* ¶ 45. Hurtado was on Fuerte's payroll until April 2016, while Rosy was on Fuerte's payroll until June 2016. *Id.* ¶ 29.

[12] Perez's 2017 deposition testimony suggests her recollection of whether Fuerte operated out of Plainfield Road in December 2015 may have been fuzzy, but her answers about where she conducted operations on behalf of Innovation in December 2015 were clear and unambiguous. [111-3] at 92. Perez's subsequent affidavit from June 2019, which states that Innovation "never operated" from the Plainfield Road property until March 2016, [122-1] at 10, directly contradicts her previous sworn testimony, without explaining the contradiction or attempting to resolve the disparity, like by providing the address of Innovation's operations from December 2015 to February 2016. *See Bank of Illinois*, 75 F.3d at 1168. Consequently, I

Hurtado immediately began helping Innovation get work.[13] While many facts about one commercial project are disputed, the parties agree that in December 2015, Hurtado referred the project to Innovation and actively helped Innovation obtain it, by meeting with the client and using his expertise to develop Innovation's proposal. [120] ¶¶ 54–56; [131] ¶¶ 23–24; [111-5] at 57.

The last week of January 2016, Fuerte stopped providing snow removal services, and Innovation started in February 2016. [120] ¶ 58; [131] ¶ 6. While the parties dispute many facts about one contract, they agree that initially Fuerte entered into a contract with a client to provide snow plowing and salting services from approximately October 2015 to May 2016. [120] ¶ 30. Hurtado either referred or requested transferring the work to Innovation, and under a separate contract, Innovation provided the remaining snow removal services. [131] ¶¶ 9–10. To complete the job, Innovation purchased some equipment, used equipment previously rented by Fuerte, for free, and paid Hurtado personally to use trucks he owned. *Id.* ¶ 26.[14]

---

disregard this specific claim in paragraph 11 of Perez's subsequent affidavit and grant plaintiffs' motion to strike the sentence. Innovation also cites Hurtado's new statement that "Fuerte and Innovation never operated from the same location at the same time," which the funds controvert. [131] ¶ 2. Innovation then explained that Hurtado meant that the two companies never did the same type of work from the same location at the same time. [137] at 6. If that's what Hurtado meant, then his testimony does not controvert or raise a genuine dispute about where Perez reported to work in December 2015. There is no dispute that both companies existed and worked from Plainfield Road in late 2015 and early 2016.

[13] The parties argue about whether Fuerte assigned or transferred, or alternatively, referred, work to Innovation. [131] ¶¶ 3, 10–11.

[14] As president of Innovation, Perez can competently testify about any equipment purchased, rented, or used by Innovation to complete a project.

In January 2016, Innovation also started bidding on public park construction projects in northeast counties of Illinois. [120] ¶ 71; [131] ¶ 34. Perez testified that early on in 2016, Hurtado assisted her with preparing park construction bids, including estimating labor costs and hours and determining material quantities and measurements. [120] ¶ 72. In 2017, Perez was able to prepare estimates on her own, but Hurtado still reviewed them. *Id.* ¶ 73.[15]

Innovation officially hired Hurtado in March 2016 as a "Residential and Landscape Maintenance Supervisor." *Id.* ¶ 67. While Hurtado was simultaneously employed by another company, D&J Landscaping, [131] ¶ 32, he played a crucial role in obtaining projects for Innovation. In April 2016, Hurtado helped secure a contract with Crete Park District for Innovation. [120] ¶ 68. At Hurtado's direction, Rosy emailed Crete Park District a quote, which listed Hurtado as the main point of contact. *Id.* That same month, Hurtado met with Calumet Park District representatives about a park project and submitted a proposal, which Perez approved. [120] ¶ 69; [131] ¶ 33. In May 2016, Hurtado met with representatives from St. Charles Park District about a project. [120] ¶ 70. That same month, a St. Charles

---

[15] Innovation claims, based on Perez's sworn affidavit, that Hurtado has done estimating since November 2016. [131] ¶ 35; [122-1] at 12. This statement implicitly suggests Hurtado was not involved in the estimating process prior to November 2016, so plaintiffs raise a dispute about this fact. [131] ¶ 35. However, Perez's new statement does not actually undermine her previous sworn testimony that Hurtado has assisted Perez prepare estimates since early 2016; in fact, Perez's new statement does not even address the scope or timing of Hurtado's assistance prior to becoming an Innovation employee in March 2016. *Id.* ¶ 32. There is no real dispute about the timing of Hurtado's assistance; Innovation even admits the facts supported by Perez's original deposition tesitmony. [120] ¶ 72. (Innovation's claim that Hurtado has done estimating since November 2016 coincides with his promotion to Innovation's general manager that same month. [131] ¶ 32.)

Park District park representative emailed Hurtado and Perez to inform them that Innovation's quote had been accepted; in the email, the park representative wrote, "Rafael, I assume the PO is to be under Innovation Landscape Inc. instead of Fuertes Systems Landscaping, Inc.?" [111-5] at 70. Due to Hurtado's expertise and years in the industry, it was common for park districts to contact him directly about projects. [131] ¶ 17. Nevertheless, Innovation had customers that were never customers of Fuerte. *Id.* ¶ 41.

In November 2016, after being laid off from D&J Landscaping, Hurtado became Innovation's general manager, supervising its labor force and contracts. *Id.* ¶¶ 20, 32, 40. While Hurtado performed high-level tasks, the parties dispute whether Perez had exclusive hiring, firing, and decision-making authority with respect to critical business decisions. *Id.* ¶ 20.[16]

Rosy, Perez's mother, also moved from Fuerte to Innovation. [120] ¶ 14. Rosy served as Fuerte's office manager from March 2013 until June 2016. *Id.* ¶ 11; [131] ¶ 29. In this role, she managed accounts payable and accounts receivable, prepared project payout documents, processed payroll and monthly fringe benefit reports to the Union, managed bank accounts, and obtained Fuerte's bid, payment, and performance bonds from insurance companies. [120] ¶ 12. While still on Fuerte's payroll, Rosy helped her daughter with Innovation's growth, as early as March 2016.

---

[16] As evidence of disagreement, the funds cite to the testimony of Perez and Francisco Corral. [131] ¶ 20. Corral was a former employee of Fuerte and Innovation and is also Hurtado's estranged son-in-law. [120] ¶ 13; [131] ¶¶ 29, 54. Innovation has evidence that undermines Corral's credibility, and credibility cannot be resolved on a motion for summary judgment. The cited testimony suffices to muddy the waters about Perez's authority, but this factual dispute does not affect the outcome of the alter-ego or single-employer analysis.

[131] ¶ 30. On March 8, 2016, Rosy executed a playground maintenance contract on behalf of Innovation and signed it as "office manager." [120] ¶ 64; [111-3] at 2. When Rosy officially joined Innovation in June 2016 as office manager, she performed the same duties as she had at Fuerte. [120] ¶ 64; [131] ¶ 30.

Two other supervisory employees from Fuerte's public park construction group moved to Innovation as well. Edgar Rubio served as Fuerte's park project superintendent. [120] ¶ 15. In this role, Rubio met and communicated with park district representatives; attended meetings; supervised field employees; ordered material; oversaw projects; and disciplined employees. *Id.* Juan Adame worked as a project foreman at Fuerte. *Id.* ¶ 17. Adame had the same responsibilities as Rubio but was only assigned to one project. *Id.* In March 2016, Innovation hired Rubio as a general manager and Adame as a project manager to perform the tasks they had performed at Fuerte; Perez did not interview anyone else for their positions. *Id.* ¶¶ 65–66. Adame also helped Innovation prepare bids. [120] ¶ 72; [131] ¶ 35.

Overall, Innovation hired ten former employees of Fuerte, in addition to Perez. Four joined Innovation's payroll in February 2016; four in March 2016; one in April 2016; and the last one (Rosy) in June 2016. [120] ¶ 58; [131] ¶ 29. Innovation also hired employees that never worked for Fuerte. [131] ¶ 29.

When Innovation reopened in 2015, it purchased some equipment and paid Hurtado to use equipment he personally owned. [120] ¶ 61; [131] ¶ 26. Innovation also used equipment rented by Fuerte, for free. *Id.* The parties dispute whether Innovation used equipment owned by Fuerte, as opposed to Hurtado, without

payment. [131] ¶ 42. The parties also dispute whether Innovation shared Fuerte's computers, bidding resources, and at least one telephone number. [120] ¶ 74; [131] ¶¶ 36, 44. The businesses had separate bank accounts, payroll, and billing functions. [131] ¶ 44.

In contractor reference or qualification statements, Innovation referenced projects completed by Fuerte. [120] ¶¶ 77–79; 82–83. Innovation also posted a picture of a Fuerte project on Innovation's Facebook page. [120] ¶ 84; [131] ¶ 39. While the parties dispute whether Innovation was passing off Fuerte's work as its own or accurately identifying the experiences of Innovation employees that used to work for Fuerte, they agree that at some point in 2016, Innovation stopped referencing Fuerte projects. [120] ¶ 80; [131] ¶ 37.

Finally, Innovation used some of the same outside professional services as Fuerte. Innovation hired the same insurance companies—one at Rosy's recommendation—to secure bid, payment, and performance bonds. [120] ¶¶ 24, 75–76; [131] ¶ 31. Even though the parties dispute attorney Robert Reda's personal involvement in Innovation's incorporation, the parties agree that Reda served as Fuerte's attorney and that Reda's firm was involved in incorporating Innovation. [120] ¶ 38; [131] ¶ 44; [111-3] at 64; [137] at 3.[17] Innovation also used Fuerte's accounting firm. [120] ¶ 41.

---

[17] In her deposition, Perez first testified that "Bob Reda" was the attorney who incorporated Innovation. [111-3] at 64. She then immediately clarified, "Well, it was Evans, but his firm. It was Evans and Bob Reda." *Id.* Her answer suggests that Evans, an attorney at Reda's law firm, prepared Innovation's incorporation paperwork and not Reda himself. Thus, Perez's initial testimony does not directly contradict the statement in her subsequent affidavit, that

## III.    Analysis

An alter ego is the "disguised continuance of a former business entity or an attempt to avoid the obligations of a collective bargaining agreement, such as through a sham transfer of assets." *Cent. States, Se. & Sw. Areas Pension Fund v. Sloan*, 902 F.2d 593, 596 (7th Cir. 1990) (internal citation and quotation omitted). The companies must generally share "substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership." *McCleskey v. CWG Plastering, LLC*, 897 F.3d 899, 903 (7th Cir. 2018).

The single-employer doctrine applies to companies that exist at the same time and when two entities are so integrated that they are treated as a single entity for certain purposes. *Cremation Soc'y of Illinois, Inc. v. Int'l Bhd. of Teamsters Local 727*, 869 F.3d 610, 616 (7th Cir. 2017) (internal citations and quotation omitted). Four factors are evaluated: 1) interrelation of operations; 2) common management; 3) centralized control of labor relations; and 4) common ownership. *Id*. While the single-employer analysis does not require proof of motive, it is similar to an alter-ego analysis. *Cent. States, Se. & Sw. Areas Pension Fund v. Sloan*, 902 F.2d at 597. Both concern the absence of an arm's length relationship between two entities. *Id*.; *Cremation Soc'y of Illinois, Inc*, 869 F.3d at 616 (internal citation omitted). Both are fact-intensive inquiries and require assessing the totality of the circumstances; no

---

"Robert Reda did not perform legal services on behalf of Innovation." [122-1] at 13. The funds' motion to strike the last sentence in paragraph 31 of Perez's affidavit is denied.

single factor is dispositive. *Cremation Soc'y of Illinois, Inc.*, 869 F.3d at 616; *McCleskey*, 897 F.3d at 903.

Federal common law applies to alter-ego and single-employer analyses under federal labor law. *See Moriarty v. Svec*, 164 F.3d 323, 329 (7th Cir.1998); *McCleskey*, 897 F.3d at 902–03. Under either theory of liability, Innovation would be responsible for Fuerte's obligations under the CBA. *Cent. Illinois Carpenters Health & Welfare Tr. Fund v. Olsen*, 467 F.App'x 513, 517 (7th Cir. 2012) (citing *Moriarty*, 164 F.3d at 332); *McCleskey*, 897 F.3d at 903.

### A.     Alter Ego

An alter ego possesses "a fraudulent intent to avoid collective bargaining obligations." *McCleskey*, 897 F.3d at 903. The funds suggest that as early as January 2008, Fuerte stopped making benefit contributions and paying union dues, as required by the terms of the CBA. [120] ¶¶ 1, 3. From January 31, 2012, until it closed, Fuerte did not pay union benefits and dues and now owes $668,236.99. *Id.* ¶¶ 1, 89. Fuerte's failure to pay is direct evidence of Fuerte avoiding its collective bargaining obligations.[18] Rosy testified that the lawsuits made it difficult for Fuerte to obtain new work. *Id.* ¶¶ 25–27. Hurtado blamed the union for Fuerte's closure, stating that "the Union went really dirty on me" and conspired to put Fuerte out of business. *Id.* ¶ 90; [131] ¶ 6. Perez reopened Innovation because Fuerte was "having

---

[18] Innovation argues that "the Funds do not even attempt to establish that there is direct evidence establishing Fuerte's intention to evade its obligations under the CBA, because there is none." [126] at 9. "Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *McCottrell v. White*, 933 F.3d 651, 657 (7th Cir. 2019) (internal citations and quotation omitted).

problems." [120] ¶ 53. The only problems alleged are the funds' lawsuits. *Id.* ¶ 90; [131] ¶ 6. This family testimony placing blame on the funds establishes antiunion animus—intent that is confirmed by Fuerte's violation of the CBA.

Many facts suggest Innovation is the "disguised continuance" of Fuerte and that they share the same business purpose. *Cent. States, Se. & Sw. Areas Pension Fund*, 902 F.2d at 596–97. In 2013, Fuerte stopped performing residential landscaping for single-family residences. [120] ¶ 6; [131] ¶ 3. When Innovation opened in 2014, its business was single-family residential landscaping. [120] ¶ 43. Fuerte referred its residential and warranty repair work to Innovation. [131] ¶ 3. In December 2015, Fuerte stopped performing public park construction. *Id.* ¶ 6. That same month, Innovation started doing commercial work, including a project that Hurtado helped Innovation secure. [120] ¶ 54; [131] ¶ 23; [111-5] at 57. Throughout 2016, Innovation's public park portfolio grew with Hurtado's help. [120] ¶¶ 68–70. In January 2016, Fuerte stopped providing snow removal services; in February 2016, Innovation started. *Id.* ¶ 58. While under a separate contract, Innovation effectively took over Fuerte's snow removal work for a client. *Id.* ¶ 30; [131] ¶ 9–10. Until it had built its own portfolio, Innovation referenced projects completed by Fuerte in client documents and online, further demonstrating that the companies offered the same services. [120] ¶¶ 77–84; [131] ¶¶ 37, 39.

The companies shared the same customer base and covered the same geographic region. They both serviced residential homeowners, park districts, municipalities, and businesses in the northeast counties of Illinois. [120] ¶¶ 6–7, 47,

71, 86–87. That Innovation and Fuerte also served different customers not only makes sense but also does not undermine the overlap of their customer base. Innovation also used the same law firm, accounting firm, and insurance companies as Fuerte. [120] ¶¶ 24, 38, 41, 75–76; [131] ¶ 31; [111-3] at 64; [137] at 3.

In short, where Fuerte stopped, Innovation began. The fact that they were not competitors supports the funds' argument that Fuerte shifted operations to Innovation, so Innovation could carry on the business. While Innovation and Fuerte did not hire all the same employees, the flow of employees between the two companies looks like a "disguised continuance." In 2014, Perez and Junior left Fuerte to work for Innovation and then returned to Fuerte in October after Innovation closed. [120] ¶ 51; [131] ¶¶ 13–14. After Innovation restarted in December 2015, it hired eleven former employees of Fuerte, including Perez, Hurtado, and Rosy. [131] ¶ 29.

In stark contrast to an "arms-length transaction with an unrelated individual or business entity," this case is full of family dealings. *Cent. States, Se. & Sw. Areas Pension Fund*, 902 F.2d at 597. Perez is Hurtado's stepdaughter and Rosy's daughter. [120] ¶ 14. As a recent high school graduate with less than a year of secretarial training, Perez lacked landscaping experience before starting Innovation. *Id.* ¶¶ 14, 37–38. She was not independent, financially or operationally. Even though she was president of the company, Perez testified that she only made a $200.00 contribution and did not seek any business loans or contemplate a business plan. *Id.* ¶ 39–40. That first year, Innovation operated from Hurtado's residence, with no evidence that

Innovation paid rent. *Id.* ¶ 37. When Innovation closed in late 2014, Fuerte paid taxes and debts that Innovation owed. *Id.* ¶ 50.

Innovation resumed under close family ties. After Perez personally purchased the Plainfield Road property, she executed a two-year commercial lease with Fuerte, even though it had been struggling to obtain work since 2013. *Id.* ¶¶ 20, 25–27; [111-4] at 1–5. Fuerte moved in and paid to improve the property. [120] ¶¶ 19, 21; [131] ¶ 7. When Fuerte began to wind down, Innovation was resurrected from the same location—Perez's residence that Fuerte rented. [120] ¶¶ 4, 19–20, 27; [131] ¶ 6; [111-3] at 92; [111-4] at 1–5. While neither Fuerte nor Hurtado provided capital to, or invested in, Innovation, [131] ¶ 5, these facts establish close contact between the companies.

The management and supervision of Innovation is substantially identical to Fuerte. *McCleskey*, 897 F.3d at 903. At Fuerte, Hurtado communicated with park district representatives; attended construction meetings; oversaw projects, tracked employee hours; prepared estimates and bids; and interfaced with clients. [120] ¶ 10. As Fuerte's office manager, Rosy managed accounts payable and receivable, prepared project payout documents, processed payroll and monthly fringe benefit reports to the Union, managed bank accounts, and obtained Fuerte's bid, payment and performance bonds from insurance companies. *Id.* ¶ 11–12; [131] ¶ 29. As described below, Hurtado and Rosy performed these same duties at Innovation.

Perez reopened Innovation because Hurtado was available to assist running it, [120] ¶ 53, suggesting that, at the very minimum, Hurtado informally supervised

Innovation's operations. In 2014, Hurtado's son Junior, a former Fuerte employee, served as Innovation's general manager. *Id.* ¶ 42. When Innovation reopened in 2015, Hurtado immediately helped Innovation secure clients. *Id.* ¶ 54; [131] ¶¶ 9–10, 23; [111-5] at 57. Since early 2016, Hurtado assisted Perez with preparing park construction bids and estimates. [120] ¶ 72. While officially hired as a "supervisor" in March 2016, *id.* ¶ 67, Hurtado performed higher-level tasks, including growing Innovation's public park construction portfolio. For example, that spring, Hurtado met with customers and secured contracts with Crete Park District and St. Charles Park District. *Id.* ¶¶ 68, 70. Clients understood Hurtado's connection to the two companies—the St. Charles park district representative wrote, "Rafael, I assume the PO is to be under Innovation Landscape Inc. instead of Fuertes Systems Landscaping, Inc.?" [111-5] at 70. Hurtado also served as the lead on a proposal submitted to Calumet Park District. [120] ¶ 69. In November 2016, Hurtado officially became Innovation's general manager, which required managing Innovation's labor force and contracts. [131] ¶¶ 20, 32, 40.

While Hurtado may not have had the ability to hire, fire, and make key decisions unilaterally, the facts show that he played the same role at Innovation as he played at Fuerte, irrespective of his title. As Innovation noted, Hurtado's years of experience made him a key figure in the industry. [131] ¶ 17. Hurtado's employment with D&J Landscaping, *id.* ¶ 32, and his decision to refer, and not assign, Fuerte's contracts to Innovation, *id.* ¶ 10, do not diminish the managerial role Hurtado played at Innovation.

Rosy formally joined Innovation in June 2016 and performed the same office manager duties as she had at Fuerte. [120] ¶ 64; [131] ¶ 30. However, she started helping Innovation even earlier, while still on Fuerte's payroll, and even purported to be Innovation's office manager. [131] ¶ 30; [120] ¶ 64; [111-3] at 2. Perez also hired the same insurance company based on Rosy's "positive experiences" when the company serviced Fuerte. [120] ¶¶ 75–76; [131] ¶ 31. Rosy's preexisting relationship may explain why Innovation, a new company with no commercial portfolio, could secure bonds for construction work.

Even if only Perez had hiring, firing, and exclusive decision-making authority, [131] ¶ 20, and Perez was not required to route decisions through her parents, Perez's lack of expertise,[19] and her voluntary reliance on the managerial roles Hurtado and Rosy played demonstrates substantially identical management and supervision.

Two former Fuerte employees hired by Innovation serve as further evidence of substantially identical management and operations. At Fuerte, Edgar Rubio, a park project superintendent, and Juan Adame, a project foreman, both communicated with park district representatives; attended meetings; supervised field employees; ordered construction material; oversaw projects; and disciplined employees. [120] ¶¶ 15, 17. Perez hired Rubio as general manager and Adame as project manager without

---

[19] Even if Perez worked as an "assistant manager" at Fuerte from October 2014 to November 2015 with expanded duties, [131] ¶ 14, Innovation does not cite any evidence suggesting Perez learned how to independently oversee and obtain commercial construction projects, interact with clients as a company executive, or supervise employees.

interviewing them, and they performed similar, if not the same, tasks at Innovation. *Id.* ¶¶ 65–66. Adame also helped Innovation prepare bids. *Id.* ¶ 72; [131] ¶ 35.

Innovation used substantially identical equipment. *McCleskey*, 897 F.3d at 903. In 2014, Innovation borrowed Fuerte's equipment and tools, for free, because Innovation did not own equipment. [120] ¶ 46. After Innovation closed, it left its tools and materials on Fuerte's premises. *Id.* ¶ 52. When Innovation reopened, it paid Hurtado to use equipment he owned and used equipment Fuerte had rented, free of charge. *Id.* ¶ 61; [131] ¶ 26. This reliance overshadows the significance of having separate bank accounts, payroll, and billing functions. [131] ¶ 44. It also negates the impact of any disputed facts about equipment. Regardless of whether 1) the equipment was owned or rented by Fuerte; 2) Fuerte turned over all of its equipment to a third-party liquidator; and 3) Innovation used Fuerte's computers, bidding resources, and at least one telephone number, Innovation still depended on Fuerte and Hurtado's equipment to successfully operate in 2014 and after reopening. [120] ¶¶ 29–36; 54–60, 62, 72, 74; [131] ¶¶ 36, 42, 44.

Finally, an alter-ego finding does not require proof of common ownership. *Trustees of Pension, Welfare & Vacation Fringe Ben. Funds of IBEW Local 701 v. Favia Elec. Co.,* 995 F.2d 785, 789 (7th Cir. 1993). This makes sense because the point of the alter ego is the disguised continuation of a business, and it would be difficult to disguise a new business if it had the same ownership structure. No one disputes that Hurtado was the sole owner and shareholder of Fuerte or that Perez was the sole shareholder and officer of Innovation. [120] ¶¶ 9, 38; [131] ¶ 1. But this difference is

not dispositive. Furthermore, familial control in the absence of an arms-length relationship can constitute "common ownership and control" in alter-ego analyses. *N.L.R.B. v. Dane Cty. Dairy*, 795 F.2d 1313, 1322 (7th Cir. 1986) (cited by *McCleskey*, 897 F.3d at 904). Here, Innovation and Fuerte are owned by members of the same family, who lived in same household and operated the same business.

Under the totality of the circumstances, the undisputed material facts establish that Innovation is the alter ego of Fuerte.

## B. Single Employer

The single-employer doctrine focuses on companies that operate at the same time, as evidenced by the four factors used to determine liability and their emphasis on a comparison of daily operations. "Interrelation of operations" evaluates day-to-day operational matters, like if the companies operate out of the same building and in the same geographic market; if one company rents the other's space; the similarity of the services; and the shared use of equipment, office space, supplies, bank accounts, and professional outside services. *Cremation Soc'y of Illinois, Inc.*, 869 F.3d at 616. The "common management" factor looks at one company's actual or active control over the other company's day-to-day operations. *Id.* at 617. Examples include when the same person manages both businesses, or when employees of both companies report to the same managers or make up the same organizational chart. *Id.* "Centralized control of labor relations" concerns who is responsible for hiring, firing and evaluating employees. *Id.* Factors include whether the companies share the same human resources manager; have the same procedures for hiring, firing, evaluating,

and training employees; and implement the same accounting, payroll, and information technology services. *Id.* "Common ownership" looks at owners and shareholders of each company. *Id.* Because the funds bear the burden of persuasion at trial, they must support their single-employer claim with credible evidence that would entitle them to a directed verdict if not controverted at trial. *Celotex Corp.*, 477 U.S. at 331.

Alter-ego liability does not guarantee single-employer liability. *See Cent. States, Se. & Sw. Areas Pension Fund*, 902 F.2d at 597; *Trustees of Pension, Welfare & Vacation Fringe Ben. Funds of IBEW Local 701*, 995 F.2d at 789. Here, the alter-ego analysis establishes "interrelation of operations." However, there are insufficient facts to demonstrate simultaneous "common management" and "centralized control of labor relations." The funds lack undisputed evidence about the control Hurtado or Rosy exercised over Innovation's day-to-day operations, like whether Innovation employees, including Perez, reported to them. While Hurtado and Rosy undoubtedly played supervisory roles, the funds' do not present enough evidence to establish that they hired, fired, and evaluated Innovation employees, a key factor for determining "centralized control of labor relations." Nor is there sufficient evidence to suggest the companies shared the same human resources manager before 2016 or implemented the same employee practices.

The parties agree the companies were 100% separately owned. [120] ¶¶ 9, 38. "Financial control," however, can be a proxy for "common ownership" in a single-employer analysis. *Naperville Ready Mix, Inc. v. N.L.R.B.*, 242 F.3d 744, 752 (7th Cir.

2001). Innovation relied on Hurtado's referrals, expertise, and residence, and on Fuerte's equipment, financial support, and facilities. [120] ¶¶ 37, 46, 50, 68–70; [131] ¶ 3. These facts about Innovation's financial dependence suggest Fuerte and Hurtado exercised some financial control, and that the difference in ownership structure may have been nominal.

However, when evaluating the totality of the circumstances, there is a lack of undisputed evidence about the control necessary to show the daily integration that justifies single-entity treatment. Furthermore, a single-employer analysis, which focuses on companies that co-exist, may be less applicable to the second time Innovation and Fuerte were both open because Fuerte was in the process of shutting down.

## IV. Conclusion

The funds' motions to file excess pages, [107] and [129], are granted. The funds' motion for partial summary judgment, [109], is granted on its alter-ego claim and denied on its single-employer theory. The funds' motion to strike, [132], is granted in part and denied in part. A status hearing is set for January 14, 2020, at 9:30 a.m.

ENTER:

Manish S. Shah
United States District Judge

Date:  December 9, 2019